May it please the Court, my name is Scott Ford and I represent the United States of In this case the District Court clearly committed error in two separate instances, first in suppressing the physical evidence found in the defendant's vehicle based merely on the trooper's failure to Mirandize the defendant when the defendant's initial statements were otherwise voluntary, and second in failing to apply the inevitable discovery doctrine under the mistaken presumption that policy or statute must dictate that the officer tow a vehicle. What was the argument that was made not necessarily by you but from your office in connection with the District Court as to wasn't the argument not that the statements were voluntary but that Mr. Bradley was not in custody and alternatively if he was in custody then there was probable cause to go forward? That was at the initial response that the government presented based solely on what defense had submitted in their initial brief. So what happened was defense filed their motion in brief, the government responded, then we had the suppression hearing and at the conclusion of the hearing the Court asked for briefs. At that point the issues were completely narrowed to was the defendant's statement voluntary or involuntary? Well, okay, when you came back did you specifically say to the District Court that the statements were, the pre-Miranda statements, were voluntary and then did you cite Patain or D'Souma? I never cited Patain or D'Souma, Your Honor, however, I did say... They're right on point. They are right on point, Your Honor, but that wasn't the issue that was before the Court. What was before the Court and what was asked for by defense was for the physical evidence to be suppressed because the statements were involuntary. And the government did cite on pages 188 to 189 of the appendix, we stated, however, the fact the defendant is not notified prior to making a custodial statement does not necessarily mean that the statement was coerced. And then we went on to cite Elstad. Your Honor, it clearly would have been cleaner had I actually cited Patain or D'Souma, but the government's position here is that the issue, the argument that was before the Court by defense was that the statements were involuntary, therefore, the physical evidence should have been suppressed. But the argument made by you was not that. It was that he was not in custody. I did argue that, Your Honor, because the government did not believe that he was in whether or not the statements were involuntary. But the arguments you made to us on this point cite Patain and D'Souma, and so if you were really focusing on voluntariness in the District Court, you would have cited those cases, would you have not? I don't believe, I believe I probably, again, Your Honor, I really should have cited to Patain and D'Souma, but I believe that the issue before the Court was whether or not the statements were voluntary. And I would state that, you know, the District Court was presented with the correct case law on pages 174 of the appendix where defense is putting forth their argument. They state, furthermore, involuntary statements taken from an accused without issuing Miranda warnings can also lead to the suppression of physical proofs derived directly from the involuntary confession as evidenced by the doctrine expressed in Wong Song. Well, Mr. Ford, are you entitled to get your argument shifted on appeal based on what your opponent says? Because in Joseph and in other cases, we've said it's not enough for you to cite a case, you've got to articulate the argument that you're making to us in front of the District Court. You've got to put it fairly, you have to put it fairly in front of the District Court. Where did you in the District Court fairly put the argument of voluntariness and say to the Court, look, even if he was in custody, these decisions, these discussions and statements were voluntary. We're talking about voluntariness here. Your Honor, we weren't talking about voluntariness, or I'm sorry, we weren't talking about suppressing the evidence because they were custodial. We were talking throughout about whether or not the statements should be suppressed because they were involuntary. And as you stated, Your Honor, Joseph requires that we present an argument. And it defines an argument as a legal challenge that presents multiple, and I'm sorry, this is issues, it states a legal challenge that presents multiple avenues for granting relief as a broad issue. But if the legal challenge presents a single point of contention, which may not be recapped or reframed to address a conceptually distinct contention, then what we have advanced is an argument. Let's take for a moment as a working premise that we thought, well, it looks like you forfeited this. We don't think you did an adequate job of that. You still are in a posture, are you not, where, well, I should ask you. If we thought you forfeited the voluntariness argument, is your only avenue at that point inevitable discovery, or do you have something you can still say with respect to the suppression of physical evidence? Yes, Your Honor. I would say that we could still raise that argument based on good cause, and that's based on United States v. Roe, it's this circuit's, it's a decision from this circuit in 2008 that states if there's good cause, we can, even if the issue is waived at the lower court, it can still be raised. Here my position would be nobody ever asked the district court to suppress this physical evidence because the statements were merely custodial and not involuntary. Now the district court did that on its own. Again, I don't believe that we waived it. I believe that the entire argument that was before the court, what was raised by the defense and what the defense was asking for, was that the physical evidence should be suppressed because both the pre-Miranda and the post-Miranda statements were involuntary. So is it your position then the district court made findings on voluntariness concerning the first statement, the pre-Miranda statement, as well as the post-Miranda statement? Because its language seems to always focus on the post-Miranda statement. But are you saying that you think it made findings on the first? With regard to voluntariness, yes, Your Honor. I believe that the physical evidence... Where is that? Where's that? Your Honor, in the court's order on page... Appendix 32, there's a court citation to ELSTAD, and then you're arguing later on that it's a clear, quote-unquote, finding of voluntariness. It doesn't seem clear. Any time somebody uses clear, you want to take 15 steps back and punt, including in this instance. Yes, Your Honor. I understand, Your Honor, but throughout the entire district court's opinion, it focuses the pre-Miranda, as it's discussing the pre-Miranda statement, doing an analysis with regard to whether or not they were custodial. It never... But that's different than making findings about voluntariness. Whether it's custodial is different than about voluntariness, right? Yes, Your Honor, but on page 32 of the appendix, the court specifically cites two ELSTAD statements, and one statement that are otherwise voluntary within the meaning of the Fifth Amendment, must nevertheless be excluded from every... So there, the district court is specifically saying it's custodial. These statements need to be excluded because it's custodial. However, we find that it was voluntary. But the statements, if I'm looking at the same page as you, appendix, did you say 39 or 32? 32. At 39, he's talking about post-Miranda. At 33, post-Miranda. At 32, the events all seem to be post-Miranda, but let's assume there were such findings, and let's assume that you preserved the argument. We'd be in clear error land then. You'd be asking us to disturb the district court's opinion based on clear error. Assume you preserved your voluntary misargument, and assume that the district court made findings about the pre-Miranda statement being involuntary. Are we reviewing that for clear error? No, Your Honor, I'm sorry. My position is that the district court found that the pre-Miranda statements were custodial. Therefore, they should be suppressed themselves. However, they were not involuntary. It found that the post-Miranda statements were involuntary. However, we do make that attenuation argument that, again, the post-Miranda statements came after the pre-Miranda statements. Where in the record do you get that the district court ruled that the pre-Miranda statements were custodial but were voluntary? Point us to the page. Again, Your Honor, I would cite to the appendix page 32, which I already discussed, and that's where the district court cites the LSTAD. Yeah, it cites LSTAD and it quotes LSTAD in a parenthetical. You're saying that that amounts, that quoting the LSTAD case amounts to a finding of fact  I believe that... That's your second position? Whenever you look at the entire order and the way that the court broke it down, and the court made the same findings with regard to the post-Miranda statements. Right, right. But doesn't that hurt you, Mr. Ford? I mean, precisely. When it wanted to talk about voluntariness, the court knew how to talk about voluntariness and it did. When it didn't talk about voluntariness, as on page 32 of the appendix, it didn't. It talked about Bradley was... And it's very precise. It says, we find Bradley was in custody and subject to interrogation, and that's the finding. It's true, it cites LSTAD, but it doesn't say, and we find that the statements were voluntary. It says, in custody and interrogation, done. Where anywhere do you get to voluntariness was a finding with respect to the pre-Miranda statement? Well, Your Honor, again, it's my position that if you take the entire opinion as a whole and the way that the court broke it down, but having said that, I think that even if you would find that the district court did not make those findings, then I think the remedy would be to return it to the district court to make those findings. All right. And I have less than a minute left, but I would like to briefly address the inevitable discovery doctrine. Here, you have an individual who was pulled over. If I can make a suggestion, maybe we have a number of questions we're going to ask of Mr. Bradley's counsel on that, and then on rebuttal, we'll let you focus particularly on inevitable discovery. Is that okay with you? Yes, Your Honor. Thank you. Thank you. Mr. Krause? Yes. Well, the court seems interested... I think you know where to begin. But the court seems interested in the inevitable discovery argument, and we have two responses to that. First of all, the inevitable discovery doctrine is a Fourth Amendment concept and really doesn't apply to evidences as a result of involuntary statements under the Fifth Amendment. We haven't found any cases where it hasn't been applied in such a situation. Second of all... I thought the inevitable discovery rule was operative regardless of whether the police had done what they should have or shouldn't have, that the whole point of the inevitable discovery doctrine was, well, they may have done the wrong thing, but it doesn't matter because if they had done everything exactly like they should have and the defendant had said nothing, they still would have found this evidence. It still would have come to light. Isn't that what the inevitable discovery rule tells us? Yes, it does. But again... Then answer it in this context. In this context, the only evidence in this case about inevitable discovery is what Trooper Plainly... Once I saw this man had a suspended license, I was not going to let him drive off in that car. He just couldn't do it. So, I'm in the middle of the night in inclement weather on the side of a road three hours away from where this car was rented. He's not going anyplace. This thing is getting towed for sure. Once it's towed, there has to be an inventory search. If that's the only evidence, and you can correct me if I'm wrong about that, why isn't this absolutely a case where they were going to find those drugs right there in the trunk as soon as they popped it? Well, again, I'll reiterate that as far as we know, there's not been a use of the inevitable discovery doctrine in a Fifth Amendment case. The considerations under the Fourth Amendment are somewhat different under the considerations for upholding a Fifth Amendment right not to self-incriminate. But the second point is, in terms of Trooper Johnson's testimony, I think it's pretty clear and the district court made specific findings to the effect that Trooper Johnson's testimony was just not credible. No, he didn't say not credible. He always said it was speculative. Well, that's not credibility. That's just saying that maybe there can be something else, but I don't see anything in Judge Jones's opinion that says that Johnson was not being credible. Well, Your Honor, I think... Not even anything like, I don't believe you. He did not say anything explicitly along those lines, but I think it's pretty clear. A fair reading of the opinion, the district court takes Trooper Johnson to task on a number of points. He may do that, but he never says, I find your testimony incredible. So for purposes of our discussion, it's probably helpful if you lay that aside and deal with what he did say. The court did say, I think that there would be an inventory search would be speculative. Yes. You actually addressed that in your briefing, but my question to you is, what is speculative about a trooper saying, once we tow a car, it has to be inventory searched? What is it in that that is speculative? Well, what was speculative was the towing of the car. There was no basis... He had a suspended license, Mr. Krause. He was not allowed to be driving that at all. Well, that's true, but in many cases, the police don't have the car towed into the police station. They call up the renter to come pick it up, or they call up the rental agency to come pick it up. The rental agency was three hours away. It was the middle of the night in February with snow on the ground. I mean, I'm trying to deal with the facts as they exist in the record, and I'm trying to come to grips with the assertion that this is speculative. You've got a driver with a suspended license. Why wouldn't... What's speculative about saying the cop is going to get this thing towed? Well, some of the same considerations would apply in terms of the weather and it's 2 a.m. We don't know what shift is available. We don't know if there's a tow truck available. It's all... Now, wait a minute. Those aren't the answers. I mean, the point in this case, wouldn't the thing to have done with respect to the inventory search was to have put in the suppression hearing before Judge Jones, here are the police protocols. We've asked them for us, and they've provided them to us. And those police protocols for a suspended license do or do not call for a towing, and they do or do not, once it's towed, provide for an inventory search of the type that was done here. In other words, there may be an inventory search, okay, there were keys, there was a cigarette lighter, et cetera. Do they go into the trunk? Do they look very closely, or is it for a suspended license, they just said, okay, we're going to pull these things, we're going to put them in a bag. When he gets out of here, we'll give him his bag with his valuables. I don't know anything about that. And yet, there was no, the only thing we have that I can see is the testimony of Cooper Johnson. Well, it was certainly the government's responsibility, if they were introducing the inevitable discovery doctrine, that they should have come forward with a policy, and they didn't. Well, didn't they, though, under United States v. Mundy, we held the testimony about standard practices suffices to establish the existence of a procedure. So we actually, there was testimony before the district court that the court didn't take into account, and that failed to follow Mundy. But in addition, there's a Pennsylvania statute that requires a vehicle to be impounded when it's operated by an unlicensed driver. So to say this was all speculative ignores not only the testimony as offered, but the legal requirements that would have required the officers to act in the way the trooper said he would act. So how do you get, how do we, how can we affirm the district court's conclusion on inevitable discovery here when the testimony shows it's not, it doesn't support an issue of speculativeness, and that's both by his testimony as well as the legal landscape under which he was operating. Well, the district court, I think, was concerned that there was no specific policy brought into evidence. Did you ask for a specific policy to be brought into evidence? No, I don't believe so. What Mundy says is you can have rules or regulations or testimony. Here there was testimony of Johnson. Maybe it's speculative, whatever, but it's the only testimony we got so far. Well, my recollection is that Johnson's testimony was talking about what he thought he would do, not whether or not there was a policy or procedure. Oh, no, he does talk about a policy. Judge Jordan, go ahead. No, no, you're going right where I was going. Yeah. Okay. Appendix 119, question, would you have let him drive away? No. What would have happened to the vehicle? The vehicle would have been removed from the highway by being towed to a secured lot. It continues. And whenever that vehicle was removed, what would you have done with it? Quote, due to our policy, we would have conducted an inventory search as well as contacted the vehicle. Continuing, what would the inventory involve? Check the vehicle to ensure that there were no valuables to remove them and or document them. So didn't the district court err by ignoring that testimony? I don't think the district court ignored it. I think, again, I think a fair reading of the district court's entire opinion is that he did not find Rupert Johnson credible. And if I could just mention a few things on that point. If I'm speculating as to what the Philadelphia Eagles might do this fall, that doesn't mean I'm not credible. It just means I'm speculating. There's nothing in that opinion that said that the Rupert Johnson was not credible. Well, Rupert Johnson testified that the dash cam showed Bradley weaving in his lane. But looking at the dash cam videotape, there's absolutely no weaving in his lane. Rupert Johnson testified that Bradley was the top five most nervous people he's ever met. And watching the video cam, he doesn't show any signs of particular nervousness. But the question here, temporarily, we're not there. We're now back, we're at the place where the towing is, where the car is towed. And there is to be some type of inventory. And the question is, how in-depth is it? And there's nothing you have in there with respect to that. Well, that's true. Because we took the position that the inevitable discovery doctrine wouldn't apply here. And that it was, in fact, speculative testimony. And even if it had been inventory, I think there's questions of how extensive that inventory would be. Could they go into the trunk without consent? Those are issues that would have to be explored. So we don't know what would have happened as a result of this towing or inventory. Of course. Is there any further questions we have of Mr. Krause? No, thank you. No, thank you. Okay. Let's hear back from Mr. Ford on the inevitable discovery. Thank you, Your Honor. You're welcome. Yes, Your Honor. I'd like to begin by saying the court's in a unique position here, where you have that MVR, that mobile video recorder. The government's characterized the entire interaction, what happened one way, defense another, the court a third. Let's go to the inevitable discovery. What were the police protocols with respect to a car that's towed to a facility for a suspended license? Yes, Your Honor. Truthfully, Johnson testified that... What are the protocols? I mean, are there actual protocols? Yes. The Pennsylvania State Police have a policy that when a vehicle is taken into police custody and is towed, that it has to be inventory beforehand. And what does that mean? Go ahead. Your Honor, it means that Trooper Johnson would have inspected it for valuables. And I think if you look at the MVR, as soon as he pops open that trunk, within seconds, he's pulling the drugs out. This isn't where it was hidden in a wheel well. It wasn't where it was hidden in some type of nook and cranny. Again, Trooper Johnson testified that he would have had that vehicle towed. It was in a container in the trunk. Was that correct? I believe it was in a bag, Your Honor. And it was tucked behind something, was it not? I don't believe so, Your Honor. And I can't state one way or another right now on that specific point. But I would state the MVR, as soon as he pops open that trunk, I think the thing that took him time to even find those drugs was just trying to figure out how to unlock the trunk. Have you seen the actual protocols for what an inventory is to do? I have. I have seen the point, Your Honor, yes. And tell me, what do they require, to the extent you know? And again, Your Honor, what I'm telling you is going off of memory from, I believe, over a year ago when I was looking at this. But essentially, it requires that the troopers, that if the vehicle is taken into police custody, that the troopers inventory the vehicle, that they look in anywhere that there may be, that there may be valuables. And again, in all honesty, prior to coming here, I was the Chief Counsel for the State Police, so I know that I looked at that policy probably six, seven years ago. Well, the aim, Mr. Ford, is to protect the police, right? To make sure nobody can come back and say, you stole my stuff. So they look in any place where people logically put things, like a glove compartment or the trunk or, you know, they don't take the door panels off or things like that, but they look where people naturally store things, do they not? That's correct, Your Honor. And again, in this case, it was sitting right in the trunk. It was found very quickly by Trooper Johnson. Well, in part, because he knew we threw the works cocaine. He did know to look in the trunk, Your Honor, but again, if you look at the MVR, and I want to say it was around the 14 to 16-minute mark, and again, I would invite the court to look at the entire MVR. You know, it would take less than 16 minutes. We have. We have looked at it. We've seen it. And frankly, it's understandable why the district court was troubled here. I mean, we've got a circumstance here where the district court was profoundly troubled with the way this went down, and watching that dash cam video helps one understand why that was troubling, but doesn't answer the question about inevitable discovery except to the extent you've already noted. Yes, Your Honor, and I don't believe that it was speculative. Oh, yes, Your Honor, I apologize. Judge Schwartz. That's all right. Two questions. Is your reason for saying that the facts would conduct the inventory search not speculative based on the testimony I read when your adversary had the podium, so to speak? And I'm sorry, Your Honor, you broke up a little bit, so if I don't fully answer the question, let me know, but I believe your question was, yes, it was partially based on the testimony. The testimony was clear, but then you also have the other facts that are surrounding this. He's driving on a DUI suspended license, Title 75, Pennsylvania Consolidated Statute, Section 1543 says that's a mandatory minimum 60 days in jail. It's 2 in the morning. It's on a snow-covered road. It's right next to the road. Whenever Trooper Johnson comes up, this isn't where it's an arrest stop or there's a big shoulder. Trooper Johnson actually has to approach him on the passenger side of the vehicle, so it's right next to the road, and again, the evidence was in the trunk, and I'm sorry, that doesn't directly go to your point, but I believe all of those factors, specifically when combined with Trooper Johnson's testimony that he would have towed that vehicle, I don't believe it's speculative at all. And then I'd like to just, if I could just with this final question, I mentioned to your adversary sort of the legal landscape in which we know the trooper was acting, although the to know that I exceeded in the brief, but Pennsylvania law, 75 Pennsylvania Consolidated Section 6309.2 requires impoundment of vehicles driven by unlicensed drivers, and the community caretaking function, which is also recognized under Pennsylvania law, would have demonstrated that this wasn't speculative. What should we do about the fact that those legal principles weren't talked about as part of this briefing to the district court? Should that matter? No, Your Honor, because I believe that the court, that this court can take into account statutes. You know, this is law, so therefore, I mean, this is still something that this court can consider. And so would you say that that statute and the community caretaking doctrine is recognized in Pennsylvania case law would further corroborate a lack of speculativeness, or at least suggest that the district court may have erred in making that determination? Absolutely, Your Honor. Thank you. Thank you, Your Honor. I have no further questions. Thank you. Thank you, Your Honor. Thank you to both counsel, and we'll take this matter under advisement, and appreciate your being with us via audio today.